UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE SAN LUIS CENTRAL RAILROAD CO.,

Plaintiff

v.

SPRINGFIELD TERMINAL RAILWAY CO., MAINE CENTRAL RAILROAD CO., BOSTON AND MAINE CORP., and PORTLAND TERMINAL CO.,

Defendants.

C.A. No. 04-12229-PBS

OPPOSITION OF THE SAN LUIS CENTRAL RAILROAD CO. TO MOTION TO DISMISS COMPLAINT

INTRODUCTION

This case involves a straightforward issue: whether the plaintiff, The San Luis Central Railroad Co. ("San Luis Central"), can use state law remedies to collect a debt that is acknowledged to be due and owing by the defendants--Springfield Terminal Railway Co., Maine Central Railroad Co., Boston and Maine Corporation and Portland Terminal Co. (referred to collectively as "Guilford")--and to obtain other relief in order to prevent Guilford from continuing to refuse to pay its obligations as they come due. Guilford acknowledges that it is liable to San Luis Central for "car hire" and does not dispute the amount of its liability, since it is based upon Guilford's own records, but Guilford has steadfastly refused, without any explanation, much less justification, to pay such amounts.

Guilford would have the Court believe that this case involves complex and arcane issues relating to the regulation of rail transportation. As a consequence, according to

Guilford, the breach of contract and other state law remedies articulated in the complaint should be preempted pursuant to 49 U.S.C. § 10501(b). To the contrary, however, even though this action involves railroads, it has nothing to do with the economic regulation of rail transportation within the meaning of Section 10501(b). Rather, this case involves the same issues that would arise if Guilford had failed to pay other undisputed debts, such as taxes, its electricity bill or invoices for diesel fuel.

As shown below, Guilford's obligation to pay car hire is readily defined by contractual commitments which Guilford has voluntarily assumed and for which it should be held accountable. Allowing San Luis Central to collect from Guilford and to obtain other relief under state law will not adversely affect rail operations or unduly burden interstate commerce. As a consequence, there is no basis to preempt contractual and other state law remedies or to dismiss the complaint.

## FACTS

The individual defendants--known commonly as Guilford or the Springfield Terminal Rail System--are rail carriers that operate as an integrated system. Complaint at ¶ 7. San Luis Central is also a rail carrier that operates in Colorado. San Luis Central, like many rail carriers, owns rail freight cars that move throughout North America. Id. at ¶ 8. Because all rail carriers must permit their freight cars to move freely throughout the North American rail system, the rail industry has promulgated an arrangement--Circular No. OT 10, Car Service and Car Hire Agreement, or the "Car Hire Code"--to govern the payment to freight car owners by other rail rail carriers for the use of freight cars. Id. at ¶ 9. In this action, San Luis Central is seeking to collect charges for car hire, in accordance with the Car Hire Code, for San Luis Central freight cars that moved over the lines of Guilford.

San Luis Central and the individual rail carriers comprising Guilford have "subscribed" to the Car Hire Code and are, therefore, bound by its terms and conditions. Complaint at ¶ 10. The Car Hire Code governs the use of and the payment for railroad freight cars. More specifically, the Car Hire Code establishes the car hire rates for subscribers and provides rules for rail carriers, such as Guilford, that use cars owned by others to report such usage and the amounts owed as car hire to car owners, such as San Luis Central. Guilford has consistently provided accountings to San Luis Central in which Guilford has stated the amount that it owes San Luis Central for car hire, but Guilford has also consistently failed to pay such amounts, as required by the Car Hire Code. Id. at ¶¶ 12-13.

Guilford never has provided any explanation, much less any justification, for its failure to pay car hire that is acknowledged, by its own reports, to be due. Such failure required San Luis Central to incur costs, earlier this year, to collect car hire that had remained unpaid for approximately three years and to incur further costs relating to this litigation in order to collect unpaid car hire for the period from March 1, 2004 through August 31, 2004.[1] Complaint at ¶15. Guilford's actions violate its contractual obligations under the Car Hire Code. In addition, such actions are in complete disregard of Guilford's known and undisputed contractual obligations and therefore constitute knowing and willful violations of M. G. L. ch. 93A.

## ARGUMENT

### I. Guilford Cannot Meet the Standards for Dismissal for Failure to State a Claim.

A complaint may be dismissed for failure to state a claim upon which relief may be granted in accordance with Rule 12 (b) (6) only if a court is satisfied beyond doubt that no

[1] Since the filing of the complaint, Guilford has reported but has not paid the amount it owes San Luis Central for car hire for September, 2004.

conceivable set of facts could be proven consistently with the allegations of the complaint that would entitle the plaintiff to relief. Hishon v. Spalding, 467 U.S. 69 (1984). A court faced with a motion to dismiss "must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, . . . must deny the motion to dismiss." Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994). As demonstrated below, Guilford cannot demonstrate that dismissal is warranted in accordance with this standard.

II. San Luis Central's State Law Remedies are Not Preempted.

In an attempt to support its motion for the dismissal of the complaint, Guilford relies exclusively on the argument that the state law remedies upon which San Luis Central's complaint are based have been preempted by 49 U.S.C. § 10501(b). Section 10501(b) provides in relevant part that the remedies provided under "this part"--the provisions of title 49 that comprise what remains of the federal legislation regulating rail carriers--"with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law" (emphasis supplied).[2]

Guilford would have the Court interpret Section 10501(b) by reading the word "regulation" out of the statute. Indeed, Guilford argues that Congress intended to preempt state law remedies "that touch upon or concern" transportation by railroad. Guilford Memorandum at 4. As demonstrated below, however, Congress did not intend to preempt remedies for actions that are only remotely connected with rail transportation or happen to

[2] The Interstate Commerce Termination Act, 49 U.S.C. §§ 10101 et seq. ("ICCTA"), abolished the Interstate Commerce Commission ("ICC"), created the Surface Transportation Board ("STB") and amended Subtitle IV, Part A of title 49, which comprises the current version of the rail regulatory provisions formerly known as the Interstate Commerce Act.

involve a railroad defendant. As the Court of Appeals for the Eleventh Circuit has noted, express preemption pursuant to 49 U.S.C. § 10501

> applies only to "state laws with respect to regulation of rail transportation." . . . This necessarily means something qualitatively different from laws "with respect to rail transportation." . . . In this manner, Congress narrowly tailored the ICCTA preemption provision to displace only "regulation", i.e., those state laws that may reasonably be said to have the effect of "managing" or "governing" rail transportation . . . while permitting the continued application of laws having a more remote or incidental effect on rail transportation."

Florida East Coast Railway Co. v. City of West Palm Beach, 266 F.3d 1324, 1331 (11th Cir. 2001).

The STB and the courts have appropriately determined that economic regulation of rail carriers by states, such as the enforcement of local or state environmental regulations that prevented rail construction projects or ordinances that adversely impacted on the operation of trains, were preempted. The articulated basis for such decisions has been a determination that the enforcement of state statutes or local ordinances or the resort to state law contractual or tort remedies would have an adverse impact on rail operations or would constitute an unreasonable burden upon interstate commerce. Such decisions are consistent with the purpose of Congress in enacting Section 10501 as a means of removing direct economic regulation of railroads by the states while at the same time not attempting to eliminate "incidental effects that inhere in the exercise of traditionally local police powers. . . ." Florida East Coast at 1337. In contrast, the STB and courts have recognized that state regulation is not preempted when there would be no undue burden on interstate commerce or no adverse impact on rail operations.

Granting and enforcement of the state law remedies upon which San Luis Central relies will have absolutely no impact upon interstate commerce or rail operations. Indeed, Guilford has not even alleged that such remedies will have any such impact. The question

whether Guilford must pay car hire as it comes due has nothing to do with the appropriate rate of car hire, with the efficient movement of freight cars throughout the national system or with any other technical or nontechnical issues relating to the economic regulation of railroads. Rather, ordering the payment of debts acknowledged to be due by Guilford and considering the state law remedies available generally to creditors that are dealing with debtors that willfully and habitually refuse to pay obligations as they come due are remedies that are not preempted by 49 U.S.C. § 10501.

A. The STB Interprets the Scope of Preemption to be Limited to State Action that Unduly Burdens Interstate Commerce.

The STB has consistently recognized that state regulation or action is preempted only if it adversely impacts rail transportation operations or unreasonably burdens interstate commerce.[3] The STB has noted that preemption does not apply when the activity regulated is "'a merely peripheral concern' of federal law". King County, WA--Petition for Declaratory Order--Burlington Northern Railroad Line--Stampede Pass, Finance Docket No. 33095, decision dated September 25, 1996, at 4, 1996 WL 545598, affirmed City of Auburn v. U.S., 154 F.3d 1025 (9th Cir. 1998), quoting San Diego Building Trades v. Garmon, 359 U.S. 236, 243 (1959). According to the STB,

> [a] key element in the preemption doctrine is the notion that only "unreasonable" burdens are stricken down. Not all state and local regulations that affect interstate commerce fail. Only those that "conflict with" federal regulation, "interfere with" federal authority, or "unreasonably burden" interstate commerce are preempted.

Id.

Guilford is intimately familiar with the scope of preemption, having been involved in a recent case in which the STB determined that the Town of Ayer, Massachusetts could

---

[3] An agency's interpretation of the statute that it administers is entitled to great weight. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

not use its permitting and zoning regulations to prohibit Guilford from constructing a yard. Joint Petition for Declaratory Order--Boston and Maine Corporation and Town of Ayer, MA, Finance Docket No. 33971, decision dated April 30, 2001. The STB noted, however, consistently with other decisions, that state and local regulation was permissible where it did not unreasonably interfere with rail operations or unduly burden interstate commerce. Id. at 8-9. Moreover, the STB stated that whether or not state activity should be preempted was a "fact bound question." Id. at 9.

The STB has held that there is even less basis to apply the preemption doctrine when a rail carrier seeks to avoid contractual obligations that it has voluntarily assumed. In Township of Woodbridge, New Jersey, et al. v. Consolidated Rail Corporation, Finance Docket No. 42053, decision dated November 28, 2000, the rail carrier entered into an agreement with the town in order to resolve certain litigation in the New Jersey state courts. When the township attempted to enforce its remedies pursuant to the contract, the rail carrier took the position that such remedies were preempted. The STB rejected this argument, holding that 49 U.S.C. § 10501(b) could not be used to shield the rail carrier from its own contractual commitments, particularly in view of the fact that there was no evidence of unreasonable interference with interstate commerce or rail operations. The STB reiterated its view that "state and local regulation is permissible when it does not interfere with interstate rail operations." Id. at 5.

The facts in this case are very similar to the facts in Woodbridge. The parties here have entered into a contractual arrangement pursuant to which Guilford has agreed to pay car hire. When faced, however, with an attempt by San Luis Central to enforce the contract, Guilford has responded by arguing that the contract rights and remedies have been preempted. As in the Woodbridge case, preemption cannot be used to shield Guilford

from its contractual commitments, particularly when there has been no allegation, much less evidence, that enforcing such commitments would have any impact whatsoever on Guilford's rail operations or interstate commerce.[4]

B. Courts Have Also Limited the Scope of Section 10501(b) Preemption.

The courts have also recognized that 49 U.S.C. § 10501 does not preempt all state remedies simply because a rail carrier is the defendant. For example, in Holland, et al., as Trustees of the United Mine Workers of America 1992 Benefit Plan and the United Mine Workers of America 1992 Benefit Plan, et al. v. Delray Connecting Railroad Co., Number 2:03 CV 163 JM, United States District Court for the Northern District of Indiana, memorandum and order dated March 22, 2004, the issue was whether the Coal Industry Retiree Health Benefits Act, 26 U.S.C. § 9701, et seq. (the "Coal Act"), was preempted. Relying on the Coal Act, the plaintiffs sought to impose liability on the defendant railroad as an affiliate of a coal company. The court distinguished various cases in which other courts had found that preemption applied, noting that such cases involved situations in which rail operations were adversely affected. Even though the court recognized that the Coal Act might have some economic impact on the defendant railroad, the court refused to dismiss the complaint.

Other courts have found that state law claims survive a preemption attack when there is no impact on interstate commerce. For example, in Rushing v. Kansas City Southern Ry. Co., 194 F. Supp. 2d 493 (S.D. Miss. 2001), the court preempted two counts of a complaint alleging negligence and nuisance, because the effect of granting such relief would have been to impact adversely upon the rail carrier's operations. The court did not, however, preempt a third count that sought compensation and injunctive relief to prevent

[4] At a minimum, the question whether or to what extent there could be any impact on rail operations is a fact intensive issue that cannot be resolved in connection with a motion to dismiss.

the rail carrier from conducting construction activities on its property that caused rainwater to pool on the adjacent property of the plaintiffs. According to the court, a direction to the railroad to compensate the plaintiff and to correct the condition would not be the "type of economic regulation" preempted by Section 10501. Id. at 501. Similarly, in Cedarapids, Inc. v. Chicago, Central & Pac. R. Co., 265 F.Supp. 2d 1005 (N.D. Iowa 2003), a claim for rescission of a contract with a rail carrier and restitution was not preempted. In Kraus v. Santa Fe Southern Pacific Corporation, 878 F. 2d 1193 (9th Cir. 1989), the Ninth Circuit rejected a preemption argument and affirmed a judgment for tortious interference, including punitive damages, when a rail carrier improperly terminated the employment of one of its employees.[5]

III. Car Hire is a Matter of Private Contract, Not Federal Regulation.

Guilford attempts to support its preemption argument by contending that "car service" is subject to STB regulation and that the STB retains jurisdiction over "car service". To the contrary, a review of the history of the regulation of car hire rates demonstrates persuasively that the payment of car hire for most rail carriers today is governed by a voluntary agreement--the Car Hire Code--not regulation. Moreover, even if there continues to be any residual regulatory authority relating to the payment of car hire, the remedies available to San Luis Central under state law, for the reasons outlined above, are not preempted.

[5] Guilford itself has recognized that not all state law remedies and causes of action are preempted. In a recent complaint filed by Guilford with the STB (a copy of which is attached as Exhibit A), Guilford relies upon a trackage rights agreement to assert a breach of contract claim and asserts as well claims for tortious injury due to gross negligence, recklessness and willful misconduct. Boston and Maine Corporation and Springfield Terminal Railway Co. v. New England Central Railroad, Inc., Docket No. 34612. Clearly, these causes of action are not based upon any federal law; rather, they are grounded in the same body of state law upon which San Luis Central relies in this case.

A. The Car Hire Code Governs Car Hire for Subscribers.

The STB, and the ICC before the ICCTA, had the ability, pursuant to 49 U.S.C. § 11122, to "prescribe"--or to set--car hire rates. In 1977, the ICC prescribed a formula to establish such rates, but, according to the ICC itself, the formula did not work. Joint Petition for Rulemaking on Railroad Car Hire Compensation, Ex Parte No. 334 (Sub-No. 8), 9 I.C.C. 2d 1090 (1993). In 1990, various interests within the rail industry requested the ICC to permit car hire rates to be "deprescribed"--or unregulated--and set instead by agreement among the parties. Id. at 1090-91. The ICC agreed, noting that it was advancing a market oriented approach to the setting of rates by permitting carriers to enter into bilateral agreements for car hire rates. Id., decision dated February 18, 1992, 1992 WL 40708, at 1.

The agreement approved by the ICC was codified in regulations published at 49 C.F.R. § 1033. The focus of the regulations was and continues to be the establishment of the car hire rate payable by users of freight cars to owners. There was not in 1993, nor is there today, any provision of 49 C.F.R. § 1033 that addresses the question of the mechanics of payment--as distinguished from the level of the rates themselves--of car hire rates that are established in accordance with the regulations.

The Car Hire Code is the contractual arrangement by which rail carriers established procedures governing car hire. In the words of the Code, the subscribers have agreed with each other to "abide by and enforce the rules prescribed for the handling of and settlement for freight cars." Complaint at ¶ 9. The Car Hire Code addresses the details of accounting among rail carriers and payment of car hire that is determined to be due each month. The Code, for example, includes detailed provisions with respect to the calculation of amounts

due based on the applicable rates and usage, reporting procedures and record retention, payment of car hire, procedures for auditing and handling disagreements with respect to the amount of car hire charges and time limits for processing such disputes. The regulations codified at 49 C.F.R. § 1033 are an appendix to the Car Hire Code.

The Car Hire Code thus provides a comprehensive contractual framework governing car hire issues, including payment. Significantly, no carrier is bound by the Car Hire Code unless it affirmatively opts in by becoming a "subscriber". The ICC recognized that its role with respect to car hire has become limited to deciding disputes involving rail carriers that do not elect to participate as a subscriber to the Car Hire Code. Joint Petition for Rulemaking on Railroad Car Hire Compensation, Ex Parte No. 334 (Sub-No. 8), decision dated April 9, 1997, 1997 WL 191814, at 2.

The Guilford rail carriers subscribed to the Car Hire Code, thereby agreeing to be bound by the terms and conditions of the Code for purposes of car hire rates and payment of car hire. Guilford may not deny or seek to avoid its contractual obligations by attempting to use preemption as a shield.

B. The Car Hire Code Requirement of Monthly Payment is Enforceable.

Guilford argues that the Car Hire Code does not expressly provide a remedy for failure to pay and that this alleged failure is an indication that the sole remedy available to San Luis Central is under federal legislation. Guilford Memorandum at 10, fn. 8. As demonstrated below, Guilford misses the point.

Section 12 of the Code provides for payment by requiring that the "settlement of amounts accruing for the use of cars shall be made monthly . . . ." In railroad terminology, "settlement" means payment. While the Code includes detailed rules for contesting the amount alleged to be due, there are no such elaborate provisions addressing remedies for

failure to pay when there is no dispute as to the amount. The appropriate conclusion is that parties are left to traditional contract remedies for breaches of the obligation to pay pursuant to the Code.[6]

IV. The Engelhard Decision Does Not Compel Preemption in this Case.

Guilford relies on Engelhard Corp. v. Springfield Terminal Railway Co. and Consolidated Rail Corporation, 193 F. Supp.2d 385 (D.Mass. 2002), a decision by Judge Stearns, for the proposition that car hire is subject to federal regulation and therefore a basis for preemption. As demonstrated below, however, the Engelhard case is distinguishable from this case and does not provide any support for the dismissal of the complaint of San Luis Central on the basis of preemption. Indeed, as explained below, Engelhard supports the position of San Luis Central in that the STB, in deciding an issue referred to it by Judge Stearns, has made it clear that privately negotiated portions of tariffs or regulations that are not reviewed by the STB have no "regulatory effect" and therefore no preemptive effect.

Engelhard is the owner and lessee of tank cars which moved over the lines of Guilford and Conrail, neither of which paid certain "allowances"--charges analogous to car hire and payable by railroads for the use of privately owned cars--due in respect of Engelhard's tank cars. Engelhard's complaint expressly alleged violations of 49 U.S.C. §§ 11121 and 11122, as well as certain claims under state law. The defendant railroads each

[6] It is fair to infer that the drafters of the Code assumed that, once the amount due for car hire was calculated and reported, payment would automatically follow. The drafters were unlikely to have contemplated a situation, such as the one before this Court, in which a user of cars would properly calculate and report the amount due but refuse to pay.

took the position that the other was responsible to Engelhard for the allowances in question.

At the request of Engelhard, Judge Stearns referred several issues to the STB, one of which was whether Engelhard was entitled under Tariff 6007 to collect allowances for cars that were leased to but not owned by Engelhard. In its decision, the STB discussed the history of Tariff 6007, noting that it was the product of industrywide negotiation and eventual ICC approval in 1986. Engelhard Corp.--Petition for Declaratory Order--Springfield Terminal Railway Co. and Consolidated Rail Corporation, Docket No. 42075, decision dated September 24, 2004 (a copy of which is attached as Exhibit B), at 6. The STB stated that, to the extent that provisions included in Tariff 6007 were before the ICC, the tariff has "regulatory effect" and that signatories are bound by its terms. The STB noted that many of the detailed administrative provisions of Tariff 6007 were not reviewed by and approved by the ICC. One of these detailed provisions permitted companies such as Engelhard to be paid allowances for cars that were assigned to it by lessors and provided reporting requirements to effectuate such assignments. The STB recognized that Engelhard did not always follow the detailed instructions of Tariff 6007 but that the parties had apparently agreed that literal compliance was not necessary.

The STB concluded, therefore, that Engelhard the notification requirements of the tariff had been altered by a course of dealing between the parties. Such a course of dealing would, according to the STB, supersede the provisions of Tariff 6007 regarding the mechanics of assignment. Such provisions were not part of the agreement approved by the ICC, but rather were privately negotiated. As a result, such provisions did not have "regulatory effect."

In further proceedings before Judge Stearns, Engelhard will be permitted to show that there was a course of dealing, under applicable principles of state law, that superseded the provisions of Tariff 6007 relating to assignments. This is a classic state law cause of action issue; it is clearly not a matter of regulation that preempts state law.

Like Tariff 6007, the Car Hire Code has many provisions, as described above, that were not the subject of review and approval by the ICC. As noted above, the result of the ICC's approval action with respect to matters relating to the Car Hire Code was limited to the promulgation of the regulations that are now found at 49 C.F.R. § 1033. These regulations deal exclusively with the level of rates for car hire and how those rates can be modified. Other provisions of the Car Hire Code that were not reviewed and approved by the ICC, including Section 12 requiring monthly settlement, relate to matters of payment. In the words of the STB in Engelhard, these other provisions have no "regulatory effect" that should be considered as grounds for preemption. Rather, such provisions constitute private contractual language which is binding upon railroads that subscribed to the Car Hire Code.[7]

V. Dismissal Could Lead to No Remedy At All.

Guilford contends that a Congressional intent to preempt state law remedies is evidenced by the alleged inclusion in the ICCTA of a specific remedy for the failure to pay car hire. Guilford Memorandum at 5. Guilford points the Court to 49 U.S.C. § 11704 (b),

---

[7] The view of the STB on these issues is entirely predictable and consistent with the statutory framework. The provisions of the statute that relate to car service and car hire--49 U.S.C. §§ 10745, 11121 and 11122--deal with rates to be charged for the use of cars and not with the timing or mechanics of payment of such rates. The central theme of these statutory provisions is the establishment of rates that promote appropriate levels of car ownership in order to avoid shortages or surpluses. See, e.g., United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742 (1972). The agencies have never viewed their proper roles to be involvement in the details of the payment of car hire, as distinguished from the determination of the level of rates for car hire.

which provides that a rail carrier is liable for damages sustained as a result of an act or omission in violation of "this part", referring to the rail provisions of the ICCTA. Thus, Section 11704 provides a mechanism, but no substantive rule, for recovering damages if there is a violation of some other provision of the ICCTA. Guilford, however, does not suggest any specific statutory provision that may have been violated by its failure to pay car hire. Moreover, as described above, Guilford suggests that the Car Hire Code, which is allegedly, according to Guilford, an extension of regulation by the STB, contains no express remedy for the failure to pay car hire.

Guilford's argument is a variation of the "too soon, too late" ploy. Guilford argues now that there are no state law remedies available, implying, although not directly admitting, that there is a federal remedy available. If the Court were to agree that state law causes of action are preempted, Guilford would presumably be free to argue that no federal statutory provision has been violated by Guilford's failure to pay car hire. In such circumstances, according to the Guilford logic, there would be no remedy whatsoever for Guilford's blatant refusal to pay car hire that it acknowledges to be due. Such a result would be absurd and should not be endorsed by preempting state law remedies. The more reasoned and appropriate course of action would be to permit the resolution of straightforward debt collection issues pursuant to familiar state law theories of recovery, rather than to force the litigation of these claims to be "shoehorned" into an alleged federal scheme that may not provide appropriate relief.[8]

---

[8] In addition to a breach of contract claim, San Luis Central has asserted tort based theories of recovery and a chapter 93A claim and seeks injunctive relief. Even if there is a federal cause of action to recover car hire, San Luis Central should be afforded the same opportunity as other creditors of Guilford to obtain relief generally available when a defendant willfully and repeatedly refuses to pay acknowledged obligations.

CONCLUSION

For the reasons stated above, the Court is respectfully requested to deny the motion to dismiss. San Luis Central should be permitted to proceed to prove the claims set forth in its complaint. If, contrary to the arguments set forth above, the Court is inclined to dismiss such state law claims, San Luis Central should be permitted to amend its complaint in order to articulate the federal causes of action that Guilford contends exist for its refusal to pay car hire.

Respectfully submitted,

THE SAN LUIS CENTRAL RAILROAD CO.
By its attorney,

James E Howard

James E. Howard
BBO # 545565
One Thompson Square
Suite 201
Charlestown, Massachusetts 02129
617-886-9322

Dated: November 19, 2004

CERTIFICATE OF SERVICE

I hereby certify that I have this 19th day of November, 2004 served the foregoing Opposition of The San Luis Central Railroad Co. to Motion to Dismiss Complaint by causing a true copy to be mailed first class postage prepaid to

Robert B. Culliford
Guilford Rail System
Iron Horse Park
N. Billerica, MA 01862

James E Howard
James E. Howard