UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAN LUIS CENTRAL RAILROAD CO., <br><br> Plaintiff <br><br> v. <br><br> SPRINGFIELD TERMINAL RAILWAY CO., MAINE CENTRAL RAILROAD CO., BOSTON AND MAINE CORP., and PORTLAND TERMINAL CO., <br><br> Defendants <br><br> and <br><br> BANK OF AMERICA, <br><br> Trustee Process Defendant. | C.A. No. 04-12229-PBS |

DEFENDANTS' REPLY MEMORANDUM

I. INTRODUCTION

The Defendants in this action, the Boston and Maine Corporation, Maine Central Railroad Company, Springfield Terminal Railway Company and Portland Terminal Company (collectively "Guilford"), hereby respond to the Opposition of the San Luis Central Railroad Company ("San Luis") to Motion to Dismiss the Complaint. Relying primarily upon a cursory review of the scope of preemption pursuant to 49 U.S.C. §

10501(b), San Luis argues strenuously that state law causes of action survive in an area where the United States Surface Transportation Board ("STB") has exclusive authority to regulate and has regulated consistently, and requests this Court to deny Guilford's Motion to Dismiss or, in the alternative, to permit San Luis to amend its complaint to articulate a federal cause of action[1]. For the reasons discussed herein, this Court should grant Guilford's Motion to Dismiss.

## II. ARGUMENT

### A. The Code of Car Hire Rules is not a "contract" within the context of state law.

Despite clear statutory language granting the STB the authority to establish the compensation for the use of a freight car and, "...the other terms of any arrangement for the use by a rail carrier of a...freight car...", as well as the authority to order the payment of damages when payment is not made for the use of such cars, San Luis Central continues to argue that the Code of Car Hire Rules (the "Code") is no different than a common law contract. *49 U.S.C. §§ 11222(a), 10745*. In making this analysis, however, San Luis not only ignores the analysis of Judge Stearns in the *Engelhard* decision, but the history of the Code and how it came to pass as well. *Engelhard Corp. v. Springfield Terminal Railway Co., et. al.*, 193 F. Supp.2d 385, 390 (D. Mass. 2002), *Assoc. of American Railroads, Per Diem, Mileage, Demurrage, and Storage—Agreement*, 277 I.C.C. 413, 426 (1950)

As noted by Judge Stearns in *Engelhard*, the "contract" that Engelhard was attempting to enforce was in reality an agreement negotiated among railroads and

---

[1] It is odd that San Luis would request this opportunity, as the car hire that is subject to the complaint was paid soon after the state court action was filed, and the only issue to be decided here is whether San Luis is entitled to recover more than the car hire reported by Guilford. *See*, Exhibit A hereto.

2

submitted to the Interstate Commerce Commission for approval as a means to regulate car mileage payments. *Engelhard Corp. v. Springfield Terminal Railway Co., et. al.* 193 F. Supp.2d at 390, *Investigation of Tank Car Allowance Systems*, 3 I.C.C.2d 196 (1986). Similarly, the Code is not simply a contract negotiated by railroads among themselves, but is rather an agreement presented to the ICC for review and approval. *Assoc. of American Railroads, Per Diem, Mileage, Demurrage, and Storage—Agreement*, 277 I.C.C. 413, *Joint Petition for Rulemaking on Railroad Car Hire Compensation*, Ex Parte No. 334 (Sub-No. 8), STB served April 22, 1997, 1997 WL 191814 at unnumbered page 2, *Investigation of Adequacy of Railroad Freight Car Ownership, Car Utilization, Distribution Rules and Practices*, 362 I.C.C. 844, 845-46 (1980).

In fact, because the Code involves the joint setting of rates for car hire charges, the only way that it could exist is with the approval of the ICC/STB. In other words, the original Code was approved by the ICC pursuant to Section 5a of the Interstate Commerce Act, which required the parties to the Code to apply for ICC authority to jointly set rates if the carriers desired to do so with antitrust immunity. *Association of American Railroads—Agreement*, 277 I.C.C. at 414. As part of this statutory authority to review and approve industry wide agreements, the ICC was empowered to not only review the agreement, but also to set the terms thereof to ensure that any agreement will further the national transportation policy. *Id.* Today, the STB continues to retain the authority to review and approve industry wide agreements and to provide antitrust immunity to the participants, though importantly, the STB continues to have the authority to establish the terms of any agreement, and cannot approve any agreement unless the STB finds that it will further the national transportation policy. *49 U.S.C. §*

3

*10706(a)(2)(A), Review of Car Hire Regulation, Joint Petition for Rulemaking on Railroad Car Hire Compensation*, 1992 WL 40708 at *8. The STB is not limited in its review of such agreements to the rates that are to be agreed upon, and can establish terms and conditions beyond simply those rates. *49 U.S.C. § 10706(a)(2)(A)*. Clearly, therefore, the Code is not simply a contract negotiated among several parties, but is an ICC/STB approved agreement that continues to be subject to substantial scrutiny[2].

Furthermore, the ICC and the STB did not—and could not—delegate authority over car service by allowing the industry to develop and implement the Code. *49 U.S.C. §§ 11121, 11122*. Rather, the STB continues to have jurisdiction to regulate car service, and to determine whether the rules adopted and implemented by the Code are reasonable. *Investigation of Adequacy of Railroad Freight Car Ownership, Car Utilization, Distribution Rules, and Practices*, 362 I.C.C. 844, 873 (1980), *49 U.S.C. §§ 11121, 11122*. In any event, by permitting the Association of American Railroads to administer the Code, the STB is simply following its express statutory authority to "designate and appoint agents to make and carry out [the STB's] directions related to car service..." *49 U.S.C. §11121(b)*. Clearly, where the STB has final regulatory approval of any agreement pursuant to section 10706 and is simply permitting its agent to negotiate and administer such an agreement, there is no basis to find that the Code in any way decreases the regulatory jurisdiction of the STB over car hire and car service issues. To the contrary, by appointing the Association of American Railroads to act as its agent in carrying out its directions in relation to car service, the STB is simply doing what it is

---

[2] In contrast to the reliance by San Luis upon the STB's *Woodbridge* decision did not involve an STB approved agreement, nor did it involve an issue that the STB is charged with regulating.

4

expressly authorized to do, while also retaining jurisdiction to ensure that its directions are carried out by that agency. *49 U.S.C. § 11121(b).*

### B. San Luis Vastly Understates the Scope of Preemption Pursuant to section 10501(b).

Despite the clear regulatory authority of the STB over all types of car service issues, San Luis attempts to salvage its state law claims by artificially limiting the scope of preemption of state law remedies pursuant to section 10501(b). Ironically, in doing so, San Luis has actually proven Guilford's point. More particularly, San Luis argues that because the STB exercises its regulatory authority over car service and car hire through its agent, preemption does not follow, which is an incorrect statement as shown by another preemption decision involving Guilford. Of course, San Luis fails to mention that the STB did not regulate the activity in question in that case, and in fact was precluded from regulating certain aspects of the project by statute. Specifically, the STB found that state and local zoning and land use ordinances are preempted by section 10501(b), notwithstanding the fact that the STB does not regulate the construction and operation of ancillary facilities or the construction and operation of sidetracks or spur tracks. *Join Petition for Declaratory Order—Boston and Maine Corp. and Town of Ayer, MA*, STB Finance Docket No. 33971 (STB Served May 1, 2001), at unnumbered page 5, *49 U.S.C. § 10906.*

Furthermore, preemption has also been found where the STB has affirmatively elected not to regulate an area of rail transportation. *G&T Terminal Packaging Co., Inc., et. al. v. Consolidated Rail Corp.*, 830 F.2d 1230. In that case, the ICC had exempted certain commodities from regulation, but continued to exercise jurisdiction over those same commodities. *Id.,* at 1235. In noting that the ICC continued to have jurisdiction,

5

the court found that allowing common law remedies to survive preemption, "...would have the effect of substituting a court's regulation for the Commission's decision in favor of deregulation." *Id.* Where, as here, the ICC and the STB have made a conscious decision to appoint the Association of American Railroads as their agent to follow its directions in relation to car service, continuing exclusive STB jurisdiction over car service issues preempts state law remedies.

Furthermore, San Luis takes great pains to analyze the STB decision in *Engelhard* to show that state common law remedies can survive preemption if negotiated privately. However, San Luis essentially ignores the central question posed to the STB, when a cause of action involving a disputed failure to pay car mileage allowances accrues. *Engelhard Corp.—Petition for Declaratory Order—Springfield Terminal Railway Co. and Consolidated Rail Corp.*, STB Docket No. 42075, at unnumbered page 1. Essentially, San Luis would ignore the fact that the STB had jurisdiction to determine when a cause of action for unpaid car mileage accrues—despite the existence of an agreement similar to the Code—and would instead argue that the STB does not have the authority to regulate the payment of car hire. Furthermore, San Luis also ignores that fact that the STB took no issue with Judge Stearns' determination that the two year statute of limitations contained in 49 U.S.C. §11705(c) applied to Engelhard's claims for unpaid car mileage. *Engelhard Corp.—Petition for Declaratory Order, footnote 1.* Of course to acknowledge that the STB agreed with Judge Stearns would be to acknowledge that a claim for unpaid car mileage—and ostensibly unpaid car hire—is a claim pursuant to 49 U.S.C. § 11704(b), the remedy that Guilford has identified as being available to San Luis. *49 U.S.C. §§ 11704(b), 11705(c).*

6

San Luis also relies upon a series of land use cases to limit the scope of preemption under section 10501(b), ignoring the fact that those cases are easily distinguishable from the present action. In the first instance, San Luis relies upon an Eleventh Circuit decision that has absolutely no applicability to the issues raised herein. *Florida E. Coast Ry. v. City of West Palm Beach*, 110 F. Supp. 2d 1367 (S.D. Fla. 2000), *aff'd*, 266 F.3d 1324 (11th Cir. 2001). Quite simply, *Florida East Coast* addressed whether the ICA applies to a non-rail business that leases railroad property. *Florida East Coast*, 266 F.3d at 1331. The activity in question there was not regulated under the ICA and was conduct of a non-carrier whose involvement with rail transportation extended no further than its lease of land from a rail carrier. *Id.* That is a far cry from the case at bar, which involves payments for rail transportation that allegedly are due by one carrier to another. San Luis also fundamentally misconstrues the scope of preemption pursuant to section 10501(b) by relying upon a series of cases that primarily involve land use and environmental issues that are not directly regulated by the STB, rather than the pure economic regulation of railroads at issue here. Of course, to make its case San Luis ignores the *Engelhard* decision and the decision in *G&T Terminal Packaging*, both of which involved direct economic regulation of a rail carrier. Moreover, San Luis also ignores the legislative history of section 10501(b), which makes it clear that it was the intent of Congress to completely preempt state law claims. As Judge Stearns noted, "In 1995, Congress eliminated what little remained of state and local regulatory authority over railroad operations…the [ICA's] legislative history makes plain Congress' intent to shield railroads from state regulation while at the same time lessening federal regulation of the railroad industry." *Engelhard Corp.*, 193 F. Supp. at 389.

Even if this Court were to adopt the limited scope of preemption pursuant to section 10501(b) proposed by San Luis, then dismissal is still proper for the simple reason that section 10501(b) evidences the intent of Congress for uniform regulation of railroads, including the regulation of car service and car hire. As the legislative history shows,

> "Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation *and to be completely exclusive. Any other construction would undermine the uniformity of federal standards and risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation.*"

H.R. Rep. No. 104-311, at 96 (1995).

Furthermore, when initially adopting the Code, the ICC itself felt that it was important to maintain uniform application of car hire rules and practices throughout the country. *Association of American Railroads—Agreement*, 277 I.C.C. at 424. If San Luis were correct in its assessment of the Code as simply a contract subject to common law and state law claims such as those brought here, it would undermine a principal purpose of the ICA and the Code to provide for uniform regulation of railroads and car service throughout the country. As a result, rail carriers would be subject to varying forms of common law and state law remedies for alleged violations of the Code in each state in which they operate, an outcome that would substantially burden this "intrisically interstate form of transportation."

Finally, in light of the extensive scope of regulation by the STB of car service issues, and the potentially complex issues raised by the parties to this action, Guilford would point out that referral to the STB for guidance would be proper in this instance. *Pejepscot Industrial Park, Inc. v. Maine Central R.R. Co.*, 215 F.3d 195 (1st Cir. 2002).

8

### III.   CONCLUSION

For the reasons stated herein and in other pleadings in this matter, Guilford respectfully requests that its motion to dismiss be allowed.

**Dated: November 30, 2004**

Respectfully submitted,

Robert B. Culliford
BBO# 638468
Iron Horse Park
North Billerica, MA 01862
(978) 663-1029
rculliford@guilfordrail.com

*Attorney for Defendants*
*Boston and Maine Corporation*
*Maine Central Railroad Company*
*Springfield Terminal Railway Company*
*Portland Terminal Company*

## CERTIFICATE OF SERVICE

I hereby certify that true copies of the foregoing documents were served on November 30, 2004, by Federal Express upon the following parties to this action:

James E. Howard
One Thompson Square
Suite 201
Charlestown, MA 02129

Bank of America
100 Federal Street
Boston, MA 02125

Dated: November 30, 2004

Robert B. Culliford